UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| GLEN D. WELCH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:19-CV-192-SNLJ |
| | ) |
| ANDREW M. SAUL, | ) |
| Commissioner of the Social | ) |
| Security Administration, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

The Commissioner of the Social Security Administration denied plaintiff Glen Welch's application for supplemental security income under Title XVI of the Social Security Act. Plaintiff now seeks judicial review (#18). The Commissioner opposes the motion (#20), and the issue is ripe. As discussed below, the Commissioner's decision is supported by substantial evidence on the record as a whole and is affirmed.

**I.     Procedural History**

Plaintiff Welch was born in 1970. He dropped out of school in the eighth grade due to his inadequate reading skills. He testified he was able to read a bit of the newspaper and could make a simple grocery list. Plaintiff's left leg was amputated above the knee in 2012 after he was injured upon jumping from a three-story building. On September 13, 2012, plaintiff was fitted with his first left lower extremity prosthesis. At that time, plaintiff was satisfied with the fit and function of the device. Records show that the leg's alignment was appropriate, the socket fit was comfortable and supportive,

1

the prosthesis suspended well, plaintiff could ambulate safely, and plaintiff could sit and stand without problem. On November 14, 2016, after Plaintiff applied for SSI, he completed a Function Report with assistance. He stated that he lived in a house with family and that he was functionally limited because he had only one leg. He left the house sometimes in a wheelchair, and he was able to go out alone. He shopped in stores for food, although someone had to help retrieve things from shelves, and he regularly attended church. Plaintiff stated that he was able to pay bills and count change. His hobbies included reading and watching television, and his ability to engage in these activities was "very good." His ability to follow written and spoken instructions also was "good." Plaintiff reported that he used crutches and a wheelchair "all the time."

On December 15, 2016, James Critchlow, D.O., conducted a consultative examination of plaintiff. Dr. Critchlow noted that after amputation of his leg, he was fitted with a prosthesis, and he could get around with the prosthesis and a pronged cane for about a year. Eventually, however, his stump atrophied, his prosthesis became too big, and he had been using a wheelchair and crutches since then. After his amputation, plaintiff also was incarcerated for some time. In prison, he was provided with a wheelchair and someone would push him around. At the time of the evaluation, plaintiff stated that he used a wheelchair all the time. He could not walk, drive, or stand unaided. Plaintiff also complained of chronic low back pain due to severe degenerative disc disease in his lumbar spine. Dr. Critchlow noted that plaintiff entered the examination room in a wheelchair. He described plaintiff as a "very muscular, stocky gentleman," who propelled himself. Plaintiff was able to arise from his wheelchair and stand on his

2

right leg while holding onto a table with his left hand.  He then was able to bend over and touch his toe.  His left stump was soft and had no skin lesions.  Plaintiff displayed "excellent upper body strength with normal dexterity."  Dr. Critchlow opined that plaintiff's stump looked fine, and with a new prosthesis and rehabilitation, plaintiff would be able to ambulate with his prosthesis and possibly a cane or walker.

    On December 28, 2016, Steven L. Douglas, M.D., examined plaintiff to establish care.  Plaintiff reported chronic back pain, lower left extremity amputation due to trauma, and chronic phantom limb pain due to the injury.  Plaintiff stated that he had jumped off a three-story building and shattered his left leg.  Upon examination, Dr. Douglas observed that plaintiff's left leg amputation was well-healed and pulses were normal in all four extremities.  His extremities displayed no clubbing, cyanosis, edema, or deformity, with normal and full range of motion of all joints.  Dr. Douglas provided medication management.  On January 17, 2017, Dr. Douglas noted that plaintiff's prosthesis was too big and "unfit" for use.  He opined that, with a new prosthesis, plaintiff "would again be able to ambulate and function in a typical community fashion."  He stated that plaintiff was "an excellent candidate for a new limb" and that plaintiff "would be able to regain function and may be able to rejoin work force to some degree if allowed a new prosthesis."  Dr. Douglas again observed that plaintiff's left leg amputation was well-healed, and there was no swelling, redness, or pain.  His pulses were normal and extremities displayed no edema.  Dr. Douglas completed a lower limb prosthetic evaluation form for plaintiff on January 25, 2017.  Dr. Douglas noted that plaintiff's "desire to run or walk potential" was high.  He currently used a walker, cane, and

wheelchair.  The doctor noted that plaintiff's residual limb did not display invagination, discoloration, scarring, delayed healing, drainage, neuroma, bony prominences, adhesions, or phantom pain.  Dr. Douglas assessed plaintiff's current function level as K3, which indicated an ability or potential to ambulate with variable cadence and perform activities beyond simple locomotion.  The doctor opined that plaintiff's expected functional level with a new prosthesis would be K4, which indicated the ability or potential for activities including high impact, stress, or energy levels.  With a new prosthesis, the doctor opined that plaintiff would be able to engage in yard work, bicycling, and sports.

Physical therapist Robert James conducted an evaluation of plaintiff for a new left above knee definitive prosthesis on January 25, 2017.  Mr. James noted that plaintiff's old prosthesis was over four years old and ill-fitting due to a 35 pound weight gain and residual limb hypertrophy.  Plaintiff stated that he enjoyed fishing, gardening, playing basketball, and riding his bicycle for exercise.  Mr. James opined that, with properly fitting prosthesis, plaintiff would be able to lead an active lifestyle, enjoy all of his hobbies, and also be able to find employment.  Plaintiff was provided with a new prosthesis on March 13, 2017.  Plaintiff was described as "well pleased" with the fit and function of the new device.  The prosthesis had appropriate alignment and suspended well, the sock fit was comfortable and supportive, there were no significant areas of pressure visible, the componentry functioned appropriately, and plaintiff was statically and dynamically aligned.  On June 26, 2017, Dr. Douglas noted that plaintiff had a prosthesis that fit well, and he was able to ambulate with a cane.  On office visits with Dr.

4

Douglas on March 26, 2018, and June 26, 2018, plaintiff stated that his wheelchair was broken and he was waiting for a new one.

On July 31, 2018, the ALJ held an administrative hearing.  Plaintiff testified that he dropped out of school in the eighth grade because of his poor reading ability.  He could read a newspaper "a little bit" and could spell out small words for a grocery list.  He stated that he "loved" and was "good" at mathematics.

Plaintiff testified that his current prosthesis was a good fit when he first got it, but now it was loose.  He was able to wear the prosthesis for 45 minutes at a time, and when he did, he was able to walk with it and a cane.  He could walk about 15 to 20 steps with the cane and prosthesis.  Plaintiff stated that he could travel a couple of blocks in his wheelchair before he got tired.  At the end of the hearing, the vocational expert, Teresa Wolford, testified.  The ALJ asked the vocational expert a hypothetical question consistent with the RFC finding.  Based on that hypothetical, the vocational expert testified that such an individual could perform jobs in the national economy, such as final assembler, document preparer, and table worker.

## II.     Disability Determination—Five Steps

A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant has a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience,

5

engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner follows a five-step sequential process when evaluating whether the claimant has a disability. 20 C.F.R. §§ 404.1520(a)(1), 416.920(a)(1). First, the Commissioner considers the claimant's work activity. If the claimant is engaged in substantial gainful activity, the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *see also* 20 C.F.R. §§ 404.1520(c), 404.1520a(d), 416.920(c), 416.920a(d).

Third, if the claimant has a severe impairment, the Commissioner considers the impairment's medical severity. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(iii), (d); 416.920(a)(3)(iii), (d).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, the Commissioner assesses whether the

6

claimant retains the "residual functional capacity" ("RFC") to perform his or her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(5)(i), 416.920(a)(4)(iv), 416.945(a)(5)(i). An RFC is "defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotations omitted); *see also* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). While an RFC must be based "on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations," an RFC is nonetheless an "administrative assessment"—not a medical assessment—and therefore "it is the responsibility of the ALJ, not a physician, to determine a claimant's RFC." *Boyd v. Colvin*, 831F.3d 1015, 1020 (8th Cir. 2016). Thus, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016). Ultimately, the claimant is responsible for *providing* evidence relating to his RFC and the Commissioner is responsible for *developing* the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). If, upon the findings of the ALJ, it is determined the claimant retains the RFC to perform past relevant work, he or she is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

    Fifth, if the claimant's RFC does not allow the claimant to perform past relevant work, the burden of production to show the claimant maintains the RFC to perform work

7

that exists in significant numbers in the national economy shifts to the Commissioner. *See Bladow v. Apfel*, 205 F.3d 356, 358–59 n.5 (8th Cir. 2000); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, the Commissioner finds the claimant not disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)( v). If the claimant cannot make an adjustment to other work, the Commissioner finds the claimant disabled. *Id.* At Step Five, even though the *burden of production* shifts to the Commissioner, the *burden of persuasion* to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

### III.   The ALJ's Decision

At Step One, the ALJ found plaintiff met the insured status requirements through the relevant period, and he had not engaged in substantial gainful activity since August 30, 2016. At Step Two, the ALJ found plaintiff suffers from the following severe impairments:  degenerative disc disease of the cervical and lumbar spine and status post above the knee amputation.  (Tr. 13.)

At Step Three, the ALJ concluded plaintiff does not have an impairment or combination of impairments that meets or equals one of the presumptively disabling impairments listed in the regulations.

Next, in Step Four, the ALJ determined plaintiff's RFC.  The ALJ found that plaintiff

> has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 416.967(a) except the claimant would require a cane for all periods of standing or walking, no pushing or pulling, including foot controls with

>the lower left extremity, no climbing of ramps, stairs, ladders ropes or scaffolds, no kneeling, crouching, crawling, occasional balancing and stooping, and no exposure to hazards.

(Tr. 14). As part of this determination, the ALJ found that the objective evidence did not corroborate the plaintiff's allegations.

Based on this RFC determination, the ALJ determined plaintiff is not able to perform any past relevant work.

At Step Five, the ALJ also analyzed whether plaintiff can successfully adjust to other work. The ALJ relied on vocational expert ("VE") testimony to determine whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and RFC. The VE testified the plaintiff would be able to perform the requirements of representative occupations such as final assembler, document preparer, and table worker.  The ALJ then found these jobs exist in significant numbers in the national economy and concluded plaintiff is not disabled.

**IV.  Standard of Review**

The Court must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. 42 U.S.C. §§ 405(g); 1383(c)(3). Substantial evidence is less than a preponderance of the evidence but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (alteration in original) (*quoting Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987)). The Court must also consider

9

any evidence that fairly detracts from the Commissioner's decision. *Id.* "[I]f there is substantial evidence on the record as a whole, [the Court] must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992). In reviewing whether the ALJ's decision was supported by substantial evidence, this Court does not substitute its own judgment for that of the ALJ—even if different conclusions could be drawn from the evidence, and even if this Court may have reached a different outcome. *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010).

**V.     Discussion**

Plaintiff makes two arguments in favor of reversal.

First, plaintiff argues the ALJ committed reversible error when he characterized plaintiff's education as "limited." Plaintiff says that, if the ALJ had classified plaintiff as having a lower classification such as "marginal," which plaintiff contends aligns with the facts and testimony of the case, then he would "grid out" and plaintiff would be considered disabled.  Plaintiff argues that a "limited" classification requires that plaintiff is literate, which plaintiff says is not supported by the evidence.

Generally speaking, a 7th through 11th grade education is considered a "limited" education under 20 C.F.R. § 404.1564(b).    That same regulation states, however, that the "numerical grade level that you completed in school may not represent your actual educational abilities."  20 C.F.R. § 404.1564(b).  Plaintiff contends that ample evidence supports that he is not literate to support a "limited" educational classification.  He completed the 8th Grade in 1985.  He dropped out because, he said, he could not read well

10

enough to continue. He testified he could read the paper a "little bit" and then he could read and write smaller words like "eggs" on a grocery list but not words much bigger. He had help from his father in filling out his Function Report.

As characterized by plaintiff, the ALJ addressed plaintiff's literacy problems and lack of education as follows:

> This claimant testified that he lived with his father and dropped out of school in the eighth grade due to his inadequate reading skills. He was able to read a bit of the newspaper and could make a simple grocery list, but testified that he loved math. He had assistance completing the adult function report.

[Tr. 14.] Plaintiff says that the ALJ appears to have entirely based his finding of "limited" educational assessment on plaintiff's finishing the 8th Grade and that the ALJ did not develop the record enough to discredit plaintiff's illiteracy claims. *See, e.g.*, *King v. Apfel*, 991 F. Supp. 101 (E.D. Mo. 1997).

The regulations state that an individual is "illiterate" if he is unable to read or write, and more specifically, "cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name." 20 C.F.R. § 404.1564(b)(1). Here, plaintiff testified that his ability to follow written instructions was "good," that he liked to read as a hobby, and that he could read the newspaper a "little bit" and spell out small words for a grocery list. [Tr. 183-84, 389] Plaintiff suggests that the ALJ should have developed the record by ordering IQ testing. However, the ALJ "is required to recontact medical sources and may order consultative evaluations only if the available evidence does not provide an adequate basis for determining the merits of the disability claim." *Sultan v. Barnhart*, 368 F.3d 857, 863 (8th Cir. 2004). This Court

11

agrees with defendant that the ALJ did not need to develop the record further here, where the plaintiff had specifically marked reading as a hobby and where he stated that his ability to engage in reading was "very good."  The evidence supports the "limited" educational classification that the ALJ assigned.

Plaintiff's second argument in favor of reversal is that the ALJ arbitrarily determined a residual functional capacity ("RFC") for plaintiff that was not based on all of the medical evidence.  Specifically, plaintiff says, the ALJ's decision failed to discuss and/or acknowledge certain medical records that contradicted his conclusions concerning the plaintiff's RFC.

Plaintiff argues that he meets the criterial for listing 1.05, which states that plaintiff is disabled if he has an amputation of "one or both lower extremities at or above the tarsal region, with stump complications resulting in medical inability to use a prosthetic device to ambulate effectively, as defined in 1.00B2b, which have lasted or are expected to last for at least 12 months."  20 C.F.R. Pt. 404, Subpt. P § 1.05.

Plaintiff says that the evidence showed he had stump complications.  He says that he primarily uses a wheelchair and can only use his prosthetic for a maximum of 15 minutes because it no longer fits properly.  He can stand only two or three minutes without a cane and that with a cane he can walk about 15 to 20 steps.  He says he falls even when he tries to walk with the use of a cane.  He testified he had a bruise on the tip of his stump at the time of the hearing.  In concluding that plaintiff could walk with this prosthetic device and a cane, the ALJ relied on the plaintiff's primary care physician, the consultive examining physician, and the prison medical records.  Plaintiff complains that

the ALJ ignored the Pavet Patient Assessment Validation Evaluation test performed by the orthotics staff after plaintiff took delivery of his most recent prosthesis.  That report rated plaintiff as poor with respect to his comfort in the groin area, the distal end, suspension, ability of the knee to keep up with walking speed and ability to job/run.  Plaintiff was rated only fair in his overall comfort, balance, confidence walking in large crowds or unfamiliar places, confidence in using the prosthesis, ability to walk at slow or fast speed, ability to change speeds, ability to walk downstairs or down ramps.  Another undated Pavet Activity and Assessment performed by the orthotics staff stated that plaintiff always had pain and discomfort in that his socket was hot and he required a cane and crutches.  That assessment also reflected plaintiff said he often experiences a rash in his socket among other complaints.

The Pavet documents relied upon by plaintiff are neither dated nor signed.  Notably, it appears that the Pavet "evaluation" consists mainly of statements by plaintiff about his comfort and abilities with his current prosthesis because it notes the "age of current knee" is "over 4 years."  The evaluation concludes with a recommendation that he needed an "entire new prosthesis" due to weight gain, functional level change, irreparable damage, and normal wear and tear.  It appears, then, that this report was prepared before plaintiff received his 2017 prosthesis, and not after plaintiff "took delivery" of that prosthesis as urged in plaintiff's brief.  The record reflects plaintiff was, in fact, "well pleased" with his new prosthesis when he received it in 2017.  Thus, it is evident why the ALJ did not refer to the Pavet materials in his decision.

Plaintiff must meet all the specified criteria in order to meet the listing. *See Jones v. Astrue*, 619 F.3d 963, 969 (8th Cir. 2010).  The evidence plaintiff advances does not support that plaintiff had "stump complications resulting in medical inability to use a prosthetic device to ambulate effectively" as required by listing 1.05.  Indeed, plaintiff even testified that when his prosthesis fit appropriately, he was able to wear it for 45 minutes at a time and walk with it and a cane.

The ALJ's decision in this case reflects that he properly formulated plaintiff's RFC based on all the relevant evidence, including the treatment records, plaintiff's activities of living, the medical opinions, and Plaintiff's testimony.  20 C.F.R. §§ 404.1545(a), 416. 945(a).  *See also Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016). Specifically, the ALJ found that plaintiff could perform sedentary work with additional exertional limitations plaintiff would require a cane for all periods of standing or walking, no pushing or pulling, including foot controls with lower left extremity, no climbing of ramps, stairs, ladders, ropes or scaffolds, no kneeling, crouching, crawling, no exposure to hazards, and only occasional balancing and stooping. This RFC accounted for functional limitations caused by plaintiff's diagnoses of degenerative disc disease and left above the knee amputation.  It also is consistent with the evidence that plaintiff could ambulate with his prosthesis and a cane [Tr. 35, 389-90, 444, 479].

## VI.    Conclusion

This Court's review is limited to determining whether the ALJ's findings are based on correct legal standards and supported by substantial evidence. It does not substitute its own judgment for that of the ALJ. *McNamara*, 590 F.3d at 610. Having

14

found the ALJ's conclusions were supported by substantial evidence and that legal standards were correctly applied, this Court affirms the ALJ's decision.

Accordingly,

**IT IS HEREBY ORDERED** that the Commissioner's decision is **AFFIRMED**, and plaintiff's complaint (#1) is **DISMISSED with prejudice**. A separate judgment will accompany this Order.

Dated this 2nd day of March, 2020.

_____
STEPHEN N. LIMBAUGH, JR.
SENIOR UNITED STATES DISTRICT JUDGE